**THIRD DIVISION
DOYLE, P. J.,
REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 29, 2021**

# In the Court of Appeals of Georgia

A21A0572. STARKS et al. v. CARVER et al.

REESE, Judge.

Robert Starks and Atlanta Partners Realty, LLC, d/b/a KW Commercial Atlanta Partners ("KW") (collectively, the "Appellants") appeal from the trial court's order denying their motion for summary judgment in a negligence suit brought by Alice Carver, individually and as executor of the estate of B. A. Appling. The Appellants contend that the trial court erred in denying their motion for summary judgment because Carver's termination of the written agreement between her and the Appellants changed Carver's status from that of a client to a customer under the Brokerage Relationships in Real Estate Transactions Act ("BRRETA" or the "Act"),[1]

---

[1] OCGA § 10-6A-1 et seq.

and as a consequence, the Appellants did not breach any duty owed to Carver. For the reasons set forth infra, we agree and reverse the trial court's ruling.

Viewed in the light most favorable to the nonmoving party,[2] the record shows the following. On March 8, 2013, Carver entered into an exclusive listing agreement ("listing agreement" or the "agreement") with the Appellants to sell eight acres of unimproved land. The agreement identified KW as the broker and Starks as its "Director/Agent[.]"

In a letter dated December 10, 2015, Carver informed Starks that she wished to terminate the listing agreement in order "to step back and re-examine future plans concerning the property." The parties did not enter into another written agreement. However, approximately one month later, Starks received an offer for the property (the "contract of sale"), which he provided to Carver via e-mail on January 12, 2016. The Appellants were not parties to the contract of sale, but it stated that Carver would pay to Starks, along with the buyer's broker, "a real estate sales commission in an amount equal to eight percent . . . of the purchase price[.]"

After reviewing the contract of sale, Carver e-mailed Starks several questions regarding its terms, and Starks provided written responses. However, nothing in the

---

[2] See *Taylor v. Ameris Bank*, 356 Ga. App. 790 (849 SE2d 223) (2020).

2

e-mail exchange between Carver and Starks addressed paragraphs one or four contained in the contract of sale. Paragraph one stated that the purchase price was $576,000, which was calculated as $72,000 per acre "for an anticipated purchase of 8 acres[,]" but if a survey revealed the property "contains more or less than 8 acres, the Purchase Price shall be changed to an amount equal to $720.00 for each one hundredth of an acre shown in the Approved Survey." Paragraph four stated that the buyer could obtain an updated survey of the acres of land contained in the property "exclusive of areas contained within any public road right of way, setback lines, buffers or easements, flood plains or wetlands." Carver ultimately signed the contract of sale.

The buyer subsequently had the property surveyed, and claimed that certain buffer areas should be removed from the purchase price because the buyer required these areas for its intended use of the land. This resulted in a reduction in the price offered to Carver. At closing, Carver paid a commission to the Appellants relating to the sale.

Carver filed an action against the Appellants claiming that Starks was negligent in failing to warn her of the contractual provisions that allowed the buyer to lower the price per acre based on specific exclusions, such as buffers, and that KW was

3

vicariously liable for Starks' actions. The Appellants filed a motion for summary judgment, which the trial court denied. This Court granted the Appellants' application for interlocutory review, and this appeal followed.

> This Court reviews a trial court's ruling on a motion for summary judgment de novo. To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.[3]

With these guiding principles in mind, we turn now to the Appellants' claims of error.

1. The Appellants contend that the trial court erred in denying their motion for summary judgment because, as a matter of law, a client relationship cannot exist under the BRRETA without a written brokerage agreement, and when Carver terminated the agreement in her letter to Starks, this ended the client relationship, which changed the duties owed to Carver.

The BRRETA was enacted "to govern the relationships between sellers, landlords, buyers, tenants, and real estate brokers and their affiliated licensees to the

---

[3] *St. Mary's Health Care System v. Roach*, 345 Ga. App. 274, 276 (811 SE2d 93) (2018) (punctuation and footnotes omitted).

extent not governed by specific written agreements between and among the parties."[4]

"In place of general fiduciary duties, the Act enumerates specific duties which real estate brokers must exercise with reasonable care. These duties vary, depending upon whether a 'customer' or a 'client' relationship exists."[5] The Act defines a client as "a person who is being represented by a real estate broker in an agency capacity pursuant to a brokerage engagement[,]"[6] which must be in writing.[7] In contrast, a customer is defined as "a person who is not being represented by a real estate broker in an agency capacity pursuant to a brokerage engagement but for whom a broker may perform ministerial acts in a real estate transaction pursuant to either a *verbal or written* agreement."[8] The BRRETA also states that the receipt of a commission by a broker is not used to determine whether a brokerage relationship has been created.[9]

---

[4] OCGA § 10-6A-2 (a).

[5] *Jones v. Bill Garlen Real Estate*, 311 Ga. App. 372, 374 (715 SE2d 777) (2011) (citation, punctuation, and footnote omitted).

[6] OCGA § 10-6A-3 (6).

[7] See OCGA § 10-6A-3 (4) (stating that a brokerage engagement "means a written contract"); see also *Jones*, 311 Ga. App. at 375.

[8] OCGA § 10-6A-3 (8) (emphasis supplied).

[9] OCGA § 10-6A-11 ("The payment or promise of payment of compensation to a broker by a seller . . . shall not determine whether a brokerage relationship has

5

Here, Carver sent a letter to Starks, which undisputedly terminated the agreement.[10] Without a written agreement in place, Carver's status would, at most, have been that of a customer.[11] To overcome this issue, Carver argues that because Starks provided responses to Carver's questions about the contract of sale, and because the Appellants received a commission related to the sale, the listing agreement was renewed, thus allowing Carver's status to remain that of a client. However, this argument is inconsistent with the plain language of the BRRETA.

---

been created[.]").

[10] Although Carver's letter was sufficient to terminate the agreement, paragraph 3 states that the listing agreement "shall terminate on March 8, 2014" but would be extended automatically for 2 periods of "one hundred eighty (185) days" unless Carver or the Broker provided written notice that the agreement would not be extended. The agreement also stated that, "unless otherwise agreed to in writing by [the parties], under no circumstances shall the Term be automatically extended more than two . . . periods[.]" As the record does not show, and neither Carver nor the Appellants mention, that there was a written agreement extending the listing agreement beyond this date, it appears the agreement ended even without Carver's termination letter.

[11] See *Harrouk v. Fierman*, 291 Ga. App. 818, 821 (1) (662 SE2d 892) (2008) ("The oral agreement between [the broker and the buyer] made [the buyer], at most, a customer[.]") (punctuation and footnote omitted).

6

First, as noted above, the receipt of a commission does not determine whether a brokerage relationship has been created.[12] Therefore, the fact that the Appellants received a commission, in and of itself, did not establish Carver as their client.[13] Additionally, simply because the commission was included in the contract of sale, an agreement entered into between Carver and the buyer, also does not establish a client relationship as the Appellants were not parties to the agreement.[14]

Second, the language of the BRRETA is clear that one's status as a client is dependent upon there being a written agreement.[15] As the Supreme Court of Georgia has stated, "BRRETA is a statute in derogation of the common law. As such, the scope of BRRETA must be limited in strict accordance with the statutory language

---

[12] OCGA § 10-6A-11.

[13] See *Killearn Partners v. Southeast Properties*, 279 Ga. 144, 147 n.16 (2) (611 SE2d 26) (2005) ("BRRETA provides that the payment or promise of payment of compensation to a broker shall not determine whether a brokerage relationship has been created, but that such relationships do exist when created as otherwise described in the Act.") (citation and punctuation omitted).

[14] See OCGA § 10-6A-3 (4) (stating that an individual's status as a client is dependent upon there being a written brokerage engagement "wherein the seller . . . becomes the client of the broker").

[15] See OCGA § 10-6A-3 (6).

use therein[.]"[16] Here the parties' listing agreement terminated, and the agreement itself stated that any extension (other than two automatic extensions) would require the change to be in writing. Therefore, as a written agreement is explicitly required under the BRRETA, and the listing agreement terminated without either party entering into an extension or another written agreement, Carver's status, as a matter of law, was no longer that of a client.[17] To consider Carver a client based solely on the parties' actions would run counter to the explicit language of the statute.[18] As such, it was error for the trial court to deny the Appellants' motion for summary judgment.

2. In light of our ruling in Division 1, supra, we need not consider the Appellants' remaining claims of error as there were no allegations in the complaint that Starks violated any duties owed to a customer under the BRRETA.[19]

*Judgment reversed. Doyle, P. J., and Brown, J., concur.*

---

[16] *Killearn Partners*, 279 Ga. at 146 (2).

[17] See *Harrouk*, 291 Ga. App. at 821 (1).

[18] See *Killearn Partners*, 279 Ga. at 146 (2) ("[Statutory] language can never be extended beyond its plain and ordinary meaning.") (punctuation and footnote omitted).

[19] See OCGA § 10-6A-14 (b) (1)-(3).

8